**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MEREDITH ROSSI, individually and on behalf of all others similarly situated,<br>*Plaintiff,*<br>v.<br>McDONALD'S CORPORATION; McDONALD'S USA, LLC; and DELOITTE CONSULTING LLP,<br>*Defendants.* | Case No. ____________<br><br>JURY TRIAL DEMANDED |

# CLASS ACTION COMPLAINT

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 1

II. PARTIES ..... 4

A. Plaintiff ..... 4

B. Defendants ..... 4

C. Co-Conspirators ..... 5

III. JURISDICTION AND VENUE ..... 5

IV. FACTUAL ALLEGATIONS ..... 6

A. McDonald's Restaurants Are Independent Competitors by Design. ..... 6

B. Before the McDonald's Pricing System, McDonald's Pricing Tracked Costs, Was Decentralized, and Rose Modestly. ..... 7

C. The McDonald's Pricing System ..... 10

i. McDonald's collects every competing restaurant's confidential data. ..... 10

ii. The McDonald's Pricing System is a pricing tool that McDonald's controls. ..... 10

iii. McDonald's and its franchised competitors all price with the McDonald's Pricing System. ..... 13

iv. The system pools competitors' data to generate competing restaurants' prices. ..... 14

D. Deloitte Operates the Franchisee-Facing Layer of the McDonald's Pricing System. ..... 15

E. McDonald's Issues Recommendations in Coordinated "Pricing Rounds," and Franchisees Adhere. ..... 17

F. Prices Have Risen Every Year Since 2019. ..... 18

G. McDonald's Monitors and Enforces Adherence. ..... 21

H. Competing Restaurants Also Coordinate Directly. ..... 23

I. Defendants Concealed the Conspiracy. ..... 24

J. Enforcement Context ..... 25

V. EVIDENCE OF AGREEMENT ..... 26

A. Direct Evidence ... 26

B. Each Restaurant Knew It Was Part of a System-Wide Arrangement ... 27

C. Parallel Conduct ... 28

i. Parallel adoption of the McDonald's Pricing System ... 28

ii. Parallel price increases ... 28

D. Plus Factors ... 29

i. Exchange of competitively sensitive information ... 29

ii. Actions against unilateral self-interest ... 29

iii. Market conditions conducive to collusion ... 31

iv. Opportunities and mechanisms to collude ... 32

VI. RELEVANT MARKET AND MARKET POWER ... 32

VII. ANTITRUST INJURY ... 34

VIII. CLASS ACTION ALLEGATIONS ... 35

IX. CLAIMS FOR RELIEF ... 37

X. PRAYER FOR RELIEF ... 39

XI. JURY DEMAND ... 40

Plaintiff Meredith Rossi ("Plaintiff"), individually and on behalf of the Class defined below, brings this action against Defendants McDonald's Corporation and McDonald's USA, LLC (together, "McDonald's") and Deloitte Consulting LLP ("Deloitte," and together with McDonald's, "Defendants") for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff alleges the following on personal knowledge as to herself and on information and belief as to all other matters, based on the investigation of counsel, including review of Defendants' securities filings, earnings-call and investor-conference transcripts, franchise disclosure documents, public statements, regulatory submissions, court filings, and news reporting.

## I. NATURE OF THE ACTION

1. Every menu board at every McDonald's in America is supposed to reflect a decision made by an independent business. About 95 percent of McDonald's approximately 13,500 U.S. restaurants are owned by independent franchisees. McDonald's tells investors that franchisees "maintain control over all employment related matters, marketing and pricing decisions." And McDonald's grants no exclusive territories, by design, so that its restaurants must compete for customers.

2. That is not how McDonald's prices are actually set. Since at least 2019, McDonald's, its company-owned restaurants, and its franchisees have priced their menus using a single pricing tool that McDonald's controls (the "McDonald's Pricing System"). McDonald's has called it, among other things, its "menu pricing engine," its "pricing recommendation tool," its "Base Pricing Engine," and "a suite of proprietary pricing tools"; franchisees have used it as the "McDonald's Pricing Analyzer." The McDonald's Pricing System runs on competing restaurants' confidential transaction data, which every restaurant sends to McDonald's. It generates price recommendations restaurant-by-restaurant and item-by-item, in coordinated "pricing round[s]."

McDonald's has built and operated it with the consulting firm Deloitte, the analytics firm Tiger Analytics, and McDonald's own revenue growth management operation.

3. McDonald's executives described the arrangement to investors in their own words. Its CEO: "Both we and our franchisees, over the last couple of years, have been using a third party for pricing advisory services." Its CFO: "We use a third-party adviser that advises the franchisees as well as the company on pricing." Its next CFO, at the peak of the price increases: "we're still seeing very strong adherence with our franchisees to our pricing recommendations." And its CEO: McDonald's had built the capability "to know exactly by item, by restaurant, the ability for us to take pricing."

4. The results show up on every receipt. McDonald's U.S. prices have risen every year since 2019: roughly 6 percent in 2021, roughly 10 percent in 2022, and roughly 10 percent again in 2023, with further increases in 2024, 2025, and 2026. By McDonald's own count, the average McDonald's menu item cost about 40 percent more in 2024 than in 2019. McDonald's credited its pricing capabilities, not merely its costs, for making the increases stick: "even though we're pushing through pricing, the consumer is tolerating it well." The pricing advisers' guidance and the "data and analytical capability" behind them, McDonald's said, let it raise prices "in a way that has minimized the resistance from the customer."

5. Franchisees follow the recommendations because their businesses depend on doing so. Opening a McDonald's costs an estimated $1.5 million to $2.7 million. Franchisees have "no right to renew" their franchise license, and renewal and growth depend on McDonald's assessment at periodic "Business Reviews." McDonald's has made pricing part of those reviews. Since January 2026, franchisees must be "constructively engaging with McDonald's approved Pricing Consultant and Tools." And McDonald's CEO has told investors that "pricing noncompliance"

now figures in business reviews that affect "growth and eligibility" of franchisees to continue or expand operations.

6. To the public, McDonald's has said the opposite. Its U.S. President told customers that franchisees "set menu prices for their restaurants" and attributed the increases to costs. Its annual reports said nothing about the McDonald's Pricing System. And after Reuters revealed the existence of the pricing engine in September 2026, McDonald's publicly denied that its tools set prices and insisted that franchisees independently set menu prices.

7. McDonald's knows what this kind of arrangement is. When McDonald's was the buyer paying inflated prices, it sued its pork suppliers for exchanging confidential data through a common intermediary and called that arrangement "the modern equivalent of the proverbial smoke-filled room." McDonald's built the same arrangement for its own restaurants, with McDonald's as the intermediary.

8. This is a horizontal price-fixing conspiracy. McDonald's company-owned restaurants compete with its franchised restaurants, and the Seventh Circuit has treated an agreement among McDonald's and its franchisees restricting competition between their restaurants as a horizontal restraint among competitors. *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023). Such an agreement among competitors to fix, raise, or stabilize prices is unlawful per se.

9. Plaintiff bought menu items at McDonald's restaurants, including franchised restaurants and restaurants operated by McDonald's itself, and paid more than she would have paid had those restaurants set their prices independently. Plaintiff seeks treble damages and injunctive relief on behalf of herself and the Class.

## II. PARTIES

### A. Plaintiff

10. Plaintiff Meredith Rossi is a resident of New York, New York. During the Class Period, Ms. Rossi purchased menu items at various McDonald's restaurants and paid supracompetitive prices as a result of the conduct alleged in this Complaint.

### B. Defendants

11. Defendant McDonald's Corporation is a Delaware corporation headquartered in Chicago, Illinois. McDonald's Corporation is the parent of McDonald's USA, LLC and of the subsidiaries that own McDonald's company-owned U.S. restaurants (the "McOpCo" restaurants). McDonald's Corporation's officers, including Chairman and Chief Executive Officer Christopher Kempczinski and Chief Financial Officers Kevin Ozan and Ian Borden, made the statements about the McDonald's Pricing System described below, and McDonald's Corporation established a "revenue growth management function," which, on information and belief, works to increase profits by, among other things, coordinating pricing.

12. Defendant McDonald's USA, LLC is a Delaware limited liability company headquartered in Chicago, Illinois, and a wholly owned subsidiary of McDonald's Corporation. McDonald's USA, LLC serves as the franchisor under current U.S. franchise agreements, issues McDonald's Franchise Disclosure Document, administers the National Franchising Standards and Business Reviews, and charges franchisees a fee for "the use of the Base Pricing Engine." McDonald's USA, LLC therefore, at a minimum, oversees and controls the McDonald's Pricing System and profits from the conspiracy alleged herein.

13. Through the McOpCo restaurants, McDonald's sells menu items to consumers in competition with franchised restaurants. McDonald's is therefore both the organizer of the conspiracy and a horizontal competitor of the franchisees that participate in it.

14. Defendant Deloitte Consulting LLP is a Delaware limited liability partnership with its principal place of business in New York, New York, and a subsidiary of Deloitte LLP. Deloitte's pricing practice developed the "Strategic Pricing Analyzer," which, on information and belief, is the "McDonald's Pricing Analyzer" through which franchisees review the McDonald's Pricing System's recommendations.

15. Deloitte also employs and manages the "Pricing Advisors" who deliver pricing to restaurant clients. Each Pricing Advisor serves as "the client's first point of contact to solve their pricing needs" within a "dedicated region," uses "a custom-built pricing optimization solution" to "make appropriate recommendations," and "[p]resent[s] pricing trends during regional client meetings (2-3x per year)." On information and belief, Deloitte's Pricing Advisors deliver the McDonald's Pricing System's recommendations to competing McDonald's restaurants, and Deloitte is the "approved Pricing Consultant" with which McDonald's has required franchisees to be "constructively engaging" since January 2026. Deloitte participated in the conspiracy alleged in this Complaint as an independent co-conspirator, not merely as an agent of McDonald's.

### C. Co-Conspirators

16. The co-conspirators also include all U.S. McDonald's franchisees and the McOpCo subsidiaries. Each Defendant is jointly and severally liable for the acts of its co-conspirators in furtherance of the conspiracy, whether or not named as defendants.

## III. JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. The Court also has jurisdiction under 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one Class member is a citizen of a State different from at least one Defendant.

18. This Court has personal jurisdiction over each Defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22, and Federal Rule of Civil Procedure 4(k). McDonald's Corporation and McDonald's USA, LLC are headquartered in this District. Deloitte maintains offices in this District and, on information and belief, staffed its McDonald's pricing engagement in part from this District.

19. Venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c) because Defendants transact business and are found in this District, and a substantial part of the events giving rise to the claims, including the operation and enforcement of the McDonald's Pricing System, occurred here.

20. Defendants' conduct substantially affected interstate commerce. McDonald's restaurants operate in every State and in the District of Columbia, and the McDonald's Pricing System generated prices for restaurants nationwide.

## IV. FACTUAL ALLEGATIONS

### A. McDonald's Restaurants Are Independent Competitors by Design.

21. McDonald's earns a royalty of 4 or 5 percent of each franchised restaurant's gross sales, plus a percentage of rent and other fees, and keeps the full sales of its company-owned McOpCo restaurants. McDonald's therefore benefits directly when menu prices rise, so long as customers keep buying.

22. Each franchisee is a separate business. McDonald's franchise agreement provides that the franchisee "shall have no authority, express or implied, to act as agent of McDonald's," "is, and shall remain, an independent contractor," and that the franchisee and McDonald's "are not and do not intend to be partners, associates, or joint employers in any way."

23. McDonald's tells franchisees that they will compete with one another and with McDonald's. The franchise agreement grants no "exclusive grant, exclusive area, exclusive

territorial rights, [or] protected territory," and notes that the franchisee "may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control." McDonald's told the Federal Trade Commission in 2023 that it deliberately grants no exclusive territorial rights so that franchisees face competition from other McDonald's restaurants.

24. McDonald's represents that menu pricing is the franchisee's own decision. Its annual reports state that franchising enables an individual to "maintain control over all employment related matters, marketing and pricing decisions." McDonald's USA's President told customers that franchisees "set menu prices for their restaurants."

25. McDonald's company-owned restaurants compete directly with franchised restaurants. In a case against these same Defendants, the Seventh Circuit treated an agreement among McDonald's and its franchisees restricting competition between their restaurants as a horizontal restraint among competitors. *Deslandes*, 81 F.4th at 703.

26. Absent the conspiracy, each franchisee and each McOpCo restaurant would set its prices independently, based on its own costs, its own customers, and the prices of competing restaurants, including other McDonald's restaurants.

**B. Before the McDonald's Pricing System, McDonald's Pricing Tracked Costs, Was Decentralized, and Rose Modestly.**

27. Before the McDonald's Pricing System, McDonald's pricing was based on inflation and costs. McDonald's head of investor relations explained in 2022 that "years ago," McDonald's pricing discussions centered more on food-away-from-home and food-at-home inflation, and that those benchmarks "aren't necessarily like driving decisions as much as they probably once were years ago."

28. In 2019, McDonald's U.S. price increases roughly tracked its costs. McDonald's reported first-quarter 2019 U.S. pricing "up about 2%" while commodity costs rose "approximately 3%," and third-quarter 2019 U.S. pricing "up nearly 3%" while commodity costs rose "about 2%." McDonald's CEO described 2019 check growth (the average amount spent per transaction, which reflects both price and the mix of items purchased) as "heavily mix-driven," with a "pricing element" reflecting labor inflation that "does get priced through," *i.e.*, is incorporated into final prices.

29. At that time, McDonald's pricing capabilities were decentralized. At its 2026 Investor Day, McDonald's CEO explained that before McDonald's restructured to centralize pricing decision making, "[b]usiness functions, including menu, restaurant design, pricing analytics, indirect procurement and consumer insights were all decentralized." He further explained that before McDonald's launched its current strategy in 2019, "[w]e didn't have [a] revenue growth management function"— *i.e.*, an enterprise to coordinate pricing, promotions, and product assortment to increase profits.

30. McDonald's significantly shifted its pricing strategy with franchisees starting around 2019. McDonald's acknowledged in December 2023 that "[o]ver the last several years, we've significantly improved our pricing capabilities."

31. McDonald's collected restaurant-level data long before 2019, but did not offer a pricing tool. McDonald's 2017 Franchise Disclosure Document ("FDD") stated that McDonald's had "independent access to your sales and other restaurant-level information," and required franchisees to submit monthly "individual restaurant profit and loss statement(s)." Yet the 2017 FDD disclosed no pricing engine and no fee for any pricing tool. By 2025, McDonald's was charging franchisees a fee "for the use of the Base Pricing Engine."

32. In October 2018, as McDonald's franchisees organized an owners' association, a third-generation franchisee warned that "[t]he next control change will be the transfer of Menu Board Pricing to Deloitte and Touche," and that "[o]ur ability to price our menu boards may be one of the last controls we still have." By April 2019, franchisees were using the "McDonald's Pricing Analyzer" to set menu board prices for customers. In February 2020, Deloitte publicized its rollout of a restaurant pricing engine "[d]eveloped with one of the world's leading restaurants" to several thousand stores of a leading restaurant chain—on information and belief, this referred to McDonald's. In February 2021, Reuters reported that "[m]any McDonald's franchisees turn to consulting firm Deloitte for advice on how to set optimal pricing," and provided the example that Deloitte had recommended a price of $3.69 for the spicy and crispy versions of McDonald's new chicken sandwiches. McDonald's executives repeatedly described this shift in pricing methodology:

(a) July 2021: "[B]oth we and our franchisees take a more consumer research-based approach than we would have several years ago."

(b) October 2021: "Both we and our franchisees, over the last couple of years, have been using a third party for pricing advisory services."

(c) July 2023: McDonald's had built its pricing "capabilities" with "our third-party advisers[.]"

(d) April 2024: "[W]e've done a lot over the last several years building our pricing capabilities."

33. Reuters reports that McDonald's "has used some form of an AI pricing tool since at least 2019." The design, data inputs, and use of any earlier tools are not public and will be revealed in discovery. Plaintiff alleges that the conspiracy began no later than 2019, when, on

information and belief, McDonald's company-owned and franchised restaurants began pricing through the McDonald's Pricing System, whose recommendations were generated from pooled competitor data and designed to move prices in step across competing restaurants rather than to reflect each restaurant's independent assessment of its own costs and competitive position.

**C. The McDonald's Pricing System**

***i. McDonald's collects every competing restaurant's confidential data.***

34. McDonald's requires franchisees to transmit their confidential sales data to McDonald's: "The restaurant's transaction-level information generated by the POS, including sales, transactions, and product mix information, is stored on your server hardware and transmitted to McDonald's and held on its servers. McDonald's has independent access to this information and there are no contractual limits on its right to access such information."

35. McDonald's also has access to aggregated cashless and gift-card transaction information, and franchisees must submit monthly financial statements, including "individual restaurant profit and loss statement(s)," through McDonald's Franchisee Financial System.

36. McDonald's therefore holds each competing restaurant's nonpublic prices, unit sales, product mix, costs, and profit margins. On information and belief, franchisees do not have access to their competitors' nonpublic transaction data in the ordinary course, and the McDonald's Pricing System is the means by which each restaurant's nonpublic data informs the prices of its competitors.

***ii. The McDonald's Pricing System is a pricing tool that McDonald's controls.***

37. The McDonald's Pricing System is McDonald's pricing tool. McDonald's and its franchisees have referred to it by different names over time. Franchisees have used it as the "McDonald's Pricing Analyzer." McDonald's has described it as "a suite of proprietary pricing tools," its "Base Pricing Engine," its "approved Pricing Consultant and Tools," its "menu pricing

engine," and its "pricing recommendation tool." On information and belief, each of these names refers to the same McDonald's-controlled pricing tool (referred to herein as the McDonald's Pricing System), or to successive versions of it.

38. McDonald's has built and operated the McDonald's Pricing System with outside vendors and its own staff. McDonald's recommended that franchisees use Deloitte's price-recommendation services, and franchisees used Deloitte's "McDonald's Pricing Analyzer" to set retail prices by April 2019. According to two former employees of Tiger Analytics, Tiger now runs McDonald's pricing engine, and McDonald's regularly supplies the engine's rules and corporate targets—i.e., objectives set by McDonald's that shape the engine's recommendations. By 2023, McDonald's had built "a talented internal team" to support its pricing tools, and by 2026 it had a "revenue growth management function"— the discipline of coordinated pricing, promotions, and product assortment to grow revenue profitably. The public record does not disclose how the work of Deloitte, Tiger Analytics, and McDonald's internal team has been divided or sequenced. On information and belief, each has developed or operated the McDonald's Pricing System in coordination with McDonald's.

39. Deloitte has publicly described a restaurant pricing engine that matches the McDonald's Pricing System. In February 2020, Deloitte promoted a "Strategic Pricing Analyzer" for restaurants, which it said was "developed with one of the world's leading restaurants." Deloitte described the tool as using artificial intelligence and machine learning to combine store-level sales, price, and cost data with economic and competitive data; applying business rules supplied by the restaurant; generating recommendations through an online portal that restaurant managers log into; aligning menu prices with customers' willingness to pay; and being supported by in-market pricing advisors. Deloitte reported rolling out the tool to several thousand stores of a leading restaurant

chain, and offered compensation based on a percentage of the incremental profit the tool generated. On information and belief, that restaurant is McDonald's, and the tool Deloitte described is the "McDonald's Pricing Analyzer." The Pricing Analyzer's login page, titled "Pricing Analyzer," with an option to "Log in to review pricing recommendations and performance," bears McDonald's Golden Arches and Deloitte's name, as shown in Figure 1.

**FIGURE 1: Login Page of the McDonald's "Pricing Analyzer"**




40. McDonald's controls the McDonald's Pricing System centrally. At its September 2026 Investor Day, McDonald's CEO explained that McDonald's had restructured functions that had been decentralized—including "pricing analytics"—to establish "one McDonald's way of operating," built on "a single enterprise data foundation." At the same event, McDonald's described its "menu pricing engine" as "an industry-leading tool that provides franchisees with pricing recommendations down to the restaurant and item level," "[i]nformed by insights from millions of transactions and a broad range of market data." In August 2026, McDonald's CEO told investors that McDonald's was "close to having all our major markets on . . . one pricing engine[.]"

41. As of January 1, 2026, McDonald's formalized that the McDonald's Pricing System must be followed. McDonald's now requires franchisees to be "constructively engaging with McDonald's approved Pricing Consultant and Tools," and assesses franchisees' pricing during Business Reviews, which, under McDonald's New Term Policy, inform whether a franchisee receives a new franchise term when its 20-year term expires and whether it is eligible to acquire additional restaurants. Whatever McDonald's now says, use of the McDonald's Pricing System is not optional in practice.

***iii. McDonald's and its franchised competitors all price with the McDonald's Pricing System.***

42. McDonald's executives repeatedly confirmed that McDonald's company-owned restaurants and their franchised competitors priced with the same tool and advice:

(a) CEO Christopher Kempczinski: "Both we and our franchisees, over the last couple of years, have been using a third party for pricing advisory services."

(b) CFO Kevin Ozan: Franchisees are "advised by a third party, and the pricing mechanism or methodology that's used is a consumer-based research approach. We . . . generally try and take small increments of pricing at various times."

(c) Also CFO Ozan: "[W]e do work closely with our franchisees on pricing. We use a third-party adviser that advises the franchisees as well as the company on pricing."

(d) CFO Ian Borden: McDonald's works with "third-party advisers . . . who make recommendations to our business, including our franchisees, on how we price."

43. McDonald's treats the McDonald's Pricing System's output as its own. In October 2022, McDonald's CFO referred to "our pricing recommendations." In October 2023, speaking about the U.S. business, he described advisers "who obviously make pricing recommendations to

our business, including our franchisees." McDonald's head of investor relations explained that "we use a third party for . . . pricing recommendations."

44. McDonald's directs and invests in the system. In January 2023, McDonald's CFO referred to "the investments we've made over the last couple of years to really improve the tools, the data and the analytics that our advisers use to provide recommendations to the business."

***iv. The system pools competitors' data to generate competing restaurants' prices.***

45. The McDonald's Pricing System draws on pooled data from competing restaurants. McDonald's CEO told investors that as more customers join McDonald's digital ecosystem, "our pricing tools get sharper, our AI models get smarter." According to Reuters, the engine analyzes data from millions of daily transactions across McDonald's restaurants to generate an optimal price for each item at each location.

46. McDonald's provides the rules and corporate targets that shape the McDonald's Pricing System's recommendations for every competing restaurant. According to Tiger Analytics' former employees, those rules include focusing increases on items without a price increase in at least two years.

47. The McDonald's Pricing System also estimates how large a price increase each restaurant's customers will tolerate. In a competitive market, that tolerance would be limited by the prices of nearby competing restaurants, including other McDonald's restaurants. Because the same system generates those competitors' prices from the same pooled data, the tolerance it measures reflects the absence of that competition. According to Reuters, the franchisee interface reports each restaurant's sensitivity to price, based in part on customers' willingness to pay in the restaurant's area. McDonald's CEO described the same goal: McDonald's examines pass-through rates (the share of a price increase that translates into higher sales rather than lost customers) "to make sure that we understand the consumer's willingness to accept any pricing."

48. McDonald's recognizes the antitrust risk. According to screenshots published by Reuters, the pricing portal's terms of service warn that franchisees "may be competitors of each other," so that "it is particularly important for all Users of the Tool to understand and comply fully with anti-trust and competition laws." The same terms recite that franchisees are "always free to determine the final price"—a disclaimer that McDonald's monitoring and enforcement, described below, belie.

49. Figure 2 depicts the McDonald's Pricing System as alleged in this Complaint.

**FIGURE 2: The McDonald's Pricing System, as Alleged**




## D. Deloitte Operates the Franchisee-Facing Layer of the McDonald's Pricing System.

50. Deloitte did not simply license software to McDonald's. Deloitte employs "Pricing Advisors" who serve as "the client's first point of contact to solve their pricing needs," maintain

relationships with clients "in your dedicated region," use "a custom-built pricing optimization solution" to "make appropriate recommendations," adjust "pricing recommendations for the client" to account for "local market events," and "[p]resent pricing trends during regional client meetings (2-3x per year)."

51. Deloitte has staffed this work continuously. In May 2024, Deloitte advertised in Chicago for a pricing analyst "[s]upporting a premier client in the fast food restaurant industry," with the same responsibilities, including presenting pricing trends at regional client meetings two to three times a year. On information and belief, that client is McDonald's; Deloitte's Pricing Advisors deliver the McDonald's Pricing System's recommendations to competing McDonald's restaurants; and Deloitte's "regional client meetings" bring together franchisees that compete with one another in the same region, where they receive the same pricing trends from the same Deloitte adviser.

52. Deloitte knew that the restaurants it advised compete with one another. The pricing portal's terms of service warn users that they "may be competitors of each other." Deloitte's advice reached the item level for new national products: in 2021, Deloitte recommended that a franchisee charge $3.69 for McDonald's new spicy and crispy chicken sandwiches. And, on information and belief, Deloitte's compensation was tied to the incremental profit its pricing tool generated, giving Deloitte its own stake in higher prices.

53. By delivering recommendations generated from competing restaurants' pooled data to each of those competitors, and by convening competing restaurants to present common pricing trends, Deloitte knowingly joined and furthered the conspiracy.

**E. McDonald's Issues Recommendations in Coordinated "Pricing Rounds," and Franchisees Adhere.**

54. McDonald's demands price increases across the franchisee system in coordinated rounds. In March 2022, McDonald's CFO said: "We generally will take smaller, more frequent increases than less frequent large increases." In June 2022, McDonald's head of investor relations explained that "it takes us probably 6 to 8 weeks to get a good read on how a pricing round goes before we can decide what we might do next." He described the frequency of those price increases as a "few times a year, not like weekly, monthly."

55. Franchisees adhere. In October 2022, at the peak of the increases, McDonald's CFO told investors: "[W]e're still seeing very strong adherence with our franchisees to our pricing recommendations."

56. In January 2023, McDonald's CEO told investors that "[o]ngoing communication with our franchisees regarding the magnitude and pace of pricing will remain essential," and that "our franchisees have been great about the pace of pricing."

57. In April 2023, he explained that McDonald's had "built a very good capability over the last several years working with some external partners to know exactly by item, by restaurant, the ability for us to take pricing. And what we see is that when we follow that . . . we're able to get the pricing that we need through." He warned franchisees that "we need to stay very disciplined on pricing." On the same call, McDonald's CFO praised "the discipline that both our owner/operators and our company restaurants are bringing" to pricing.

58. In December 2023, McDonald's told investors: "When we follow our pricing tools, our ability to price at a level that the consumer will accept is significantly better than when we don't, which maximizes the flow-through rate of our price increases to sales. Franchisees see the value in this and adoption rates for our pricing strategy are high."

## F. Prices Have Risen Every Year Since 2019.

59. While the McDonald's Pricing System has operated, McDonald's U.S. prices have risen every year, by McDonald's own account:

(a) 2019: first-quarter U.S. pricing "up about 2%" and third-quarter U.S. pricing "up nearly 3%."

(b) 2020 through mid-2021: U.S. pricing up roughly 6 percent year-over-year by the second quarter of 2021, "[m]ost of [which] was pricing that was taken over the last year."

(c) 2021: U.S. pricing up "a little over 6%" for the year.

(d) 2022: U.S. pricing up "roughly 8%" in the first quarter, "just over 10%" in the third quarter, and "about 10%" for the year.

(e) 2023: U.S. pricing is up by "low double-digit level[s]" in the second quarter and "just around 10%" for the year.

(f) 2024: McDonald's projected U.S. pricing in 2024 consistent with "low single-digit inflation," described its early-2024 U.S. pricing as "carryover pricing," and reported that 2024 U.S. comparable sales "benefit[ed] from average check growth, partly offset by negative comparable guest counts."

(g) 2025: U.S. menu pricing increase of "just under mid-single digit" in the first quarter; combo meals that "could be priced over $10" by mid-year; and 2025 U.S. comparable sales that "benefit[ed] from average check growth"— *i.e.*, growth in the average amount spent per transaction

(h) 2026: comparable sales "primarily driven by positive check growth"—*i.e.*, growth in the average amount spent per transaction in the first quarter, and in the second quarter, "a fairly significant amount of price that got taken."

60. These increases compounded. Combining McDonald's reported annual menu price increases for 2021 through 2023 alone yields a cumulative increase of roughly 28 percent, and McDonald's reported that average menu prices were about 40 percent higher in 2024 than in 2019. Figure 3 shows each year's increase built on top of the last.

**FIGURE 3: Cumulative Increase in McDonald's U.S. Menu Prices, 2021–2023**




*Sources: McDonald's Corp. Q4 2021, Q4 2022, and Q4 2023 earnings calls (full-year U.S. pricing). Annual increases compounded. Baseline is 2020; price increases taken in 2020 are not included.*

61. McDonald's own figures show increases across the menu. McDonald's reported that between 2019 and 2024 the average price of medium fries rose 44 percent, a 10-piece McNuggets meal 28 percent, and a Big Mac meal 27 percent. Importantly, McDonald's hand-selected those items to rebut claims that prices had doubled; McDonald's acknowledged that across the menu as a whole, average prices rose about 40 percent.

62. By McDonald's own account, its average menu prices rose about 40 percent from 2019 to 2024, while the Consumer Price Index for food away from home rose 29 percent over the same period. This is depicted in Figure 4:

**FIGURE 4: McDonald's Average Menu Price Increase vs. Food-Away-From-Home Inflation, 2019 to 2024**




*Source: McDonald's USA, U.S. Pricing: Myths vs. Facts (May 29, 2024) (both figures as reported by McDonald's)*

63. McDonald's attributed U.S. comparable-sales growth during the increases to "strategic menu price increases." And McDonald's credited the McDonald's Pricing System, not merely costs, with making the increases stick. McDonald's reported that roughly 70 to 80 percent of its U.S. price increases continued to flow through to sales even as it raised U.S. prices by roughly 6 percent in 2021 and roughly 8 percent in early 2022. Its CEO said that "even though we're pushing through pricing, the consumer is tolerating it well." Its CFO said, "[w]e actually think we've got pricing power right now." Speaking about the U.S. business, he credited "the data and analytical capability that comes from our third-party advisers who obviously make pricing recommendations to our business, including our franchisees," with allowing McDonald's to execute increases "in a way that has minimized the resistance from the customer and maximize[d] the flow-through that we're getting as a result of those price increases." McDonald's attributed the price levels themselves to "elevated cost and inflationary pressures," and repeated that franchisees make their own pricing decisions, but credited the advisers' capability with getting customers to accept those prices.

64. McDonald's CEO explained that "there is no substitute for a Big Mac," that this "gives us pricing ability," and that McDonald's "tremendous pricing tools" had "guided us well[.]"

65. The increases have never been reversed. After 2023, the rate of increase may have slowed, but McDonald's continued to take price increases, and in August 2025 its CEO acknowledged that customers were still "seeing combo meals could be priced over $10." McDonald's current value offers, including Extra Value Meals, are priced as discounts from à la carte menu prices that rose every year from 2019 through at least 2025. The higher prices established through the McDonald's Pricing System continue to be paid on purchases today.

**G. McDonald's Monitors and Enforces Adherence.**

66. Publicly, to conceal the conspiracy, McDonald's tells investors that "we give pricing recommendations, but ultimately, it's up to the franchisees as to whether they adopt those pricing recommendations." In practice, McDonald's knows when each restaurant departs from its recommendations. McDonald's provides each restaurant's recommended prices and receives each restaurant's transaction-level data, including the prices actually charged. McDonald's therefore can, and on information and belief does, identify every instance in which a restaurant prices an item differently from the recommendation. According to Reuters, which reviewed it, a June 2026 franchisee document shows that McDonald's records franchisees' deviations from its recommendations in detail. In August 2026, discussing McDonald's Every Day Affordable Price ("EDAP") value menu, McDonald's CEO stated that "we provide recommended guidance to our franchisees. So we're quite clear in terms of what we believe is the right pricing execution," and reported that roughly one-third of the system "did not execute against what we were guiding." Five franchisees told Reuters that McDonald's pressured them to use its pricing tools. A former franchisee described calls from corporate officers when franchisees strayed from the recommendations: "You don't really have much of a choice anymore" about pricing.

67. McDonald's ties adherence to each franchisee's future as a licensed seller of McDonald's products. The franchise agreement makes adherence to McDonald's standards and policies "the essence of this Franchise," requires "strict adherence to McDonald's standards and policies as they exist now and as they may be from time to time modified," and requires franchisees to "comply with all business policies, practices, and procedures imposed by McDonald's." On information and belief, McDonald's treats adherence to the McDonald's Pricing System as one of those standards and policies, as its January 2026 requirement that franchisees be "constructively engaging with McDonald's approved Pricing Consultant and Tools" confirms.

68. Franchisees have "no right to renew or extend" their franchises. McDonald's assesses each franchisee "throughout the franchise term" at "each Business Review" under the National Franchising Standards, and a franchisee that has not consistently met those standards is likely to be denied a new term. To acquire additional restaurants, a franchisee must meet all National Franchising Standards and "support McDonald's Values and initiatives." McDonald's may "apply, modify or eliminate" these standards "as it deems appropriate." The stakes are severe: the estimated initial investment for a McDonald's restaurant ranges from $1,471,000 to $2,728,000.

69. McDonald's has made pricing an important part of the Business Review. In December 2025, McDonald's disclosed that "value has been a key Business Review criteria for many years," and that effective January 1, 2026, it would "holistically assess the outcomes" of franchisees' pricing decisions made with "the Third-Party Pricing Advisors." Under the standards effective January 2026, franchisees must be "constructively engaging with McDonald's approved Pricing Consultant and Tools." In August 2026, addressing franchisees that had not followed McDonald's EDAP pricing guidance, McDonald's CEO explained that "as we're now doing our

business reviews with franchisees, which affects things like growth and eligibility . . . pricing and pricing noncompliance in certain cases [are] part of those conversations," and that franchisees' comparative performance and Business Reviews "will be the things that get this fixed." Whatever the direction of a particular recommendation, McDonald's—not the independent franchisee—determines the "right pricing execution," and franchisees who depart from it answer for that departure in Business Reviews.

70. In short, McDonald's uses Business Reviews to bring franchisees' prices into line with McDonald's own pricing decisions and the consequences for deviating from those pricing decisions include refusing to renew their franchise license.

## H. Competing Restaurants Also Coordinate Directly.

71. Competing McDonald's restaurants meet and make collective decisions through numerous forums. The national advertising cooperative ("OPNAD") and local cooperatives are entities formed by franchisees; McOpCo restaurants are voting members; OPNAD members elect regional representatives "with operating and decision making powers"; and McDonald's provides marketing and legal personnel to OPNAD without charge. Although participation is nominally voluntary, McDonald's measures each franchisee's compliance with its "Operator Involvement standard," one of the National Franchising Standards, in part by the franchisee's "consistent involvement with OPNAD and local cooperatives."

72. McDonald's also endorses a set of national franchisee organizations (*e.g.*, the National Franchisee Leadership Alliance ("NFLA")). The NFLA describes itself as the elected representative voice of McDonald's franchisee organizations across the United States. An independent franchisee group, the National Owners Association, also represents franchisees. McDonald's also convenes franchisees, suppliers, and employees at its worldwide convention.

73. Competing restaurants also meet with Deloitte. On information and belief, Deloitte's Pricing Advisors present pricing trends to franchisees at regional meetings two to three times a year, giving competing restaurants in each region a recurring forum in which to receive common pricing information and to discuss pricing.

74. Through the McDonald's Pricing System, together with direct opportunities to conspire and McDonald's enforcement mechanisms, competing McDonald's restaurants conspired to increase and align menu board prices for customers. In 2024, McDonald's reported that "93% of our restaurants in the U.S. have committed to extending" a $5 meal deal. In 2025, the chair of the NFLA described nationally advertised $5 and $8 Extra Value Meals as reflecting "the company and franchisees' shared commitment." In 2026, McDonald's reported "unanimous alignment through the franchisee field votes" for a value menu with nationally advertised prices.

75. McDonald's and its franchisees also manage price increases jointly. In July 2024, McDonald's CEO explained: "As we absorb these cost increases in partnership with our franchisees, we look for ways to protect restaurant profitability via productivity efforts and selective price increases."

76. These statements show that competing McDonald's restaurants have the means and the practice of setting prices collectively, contrary to McDonald's representation that each franchisee sets its own prices.

**I. Defendants Concealed the Conspiracy.**

77. McDonald's repeatedly represented that franchisees independently set their own prices, including in its annual reports and on investor calls. In April 2024, for example, McDonald's CEO Christopher Kempczinski, discussing franchisees' financial position, told investors: "As you know, they control pricing." In May 2024, McDonald's USA's President told

customers that franchisees set menu prices and attributed price increases to the increased costs of running their businesses.

78. McDonald's disclosed that it and its franchisees used a common third-party pricing adviser, while insisting that each franchisee independently set its own prices. McDonald's did not disclose how the system worked: that its engine ran on pooled transaction data from competing McDonald's restaurants; that McDonald's supplied the rules and targets that shaped each competing restaurant's recommendations; and that McDonald's recorded each franchisee's deviations from the recommendations.

79. McDonald's annual reports do not disclose the McDonald's Pricing System, its data inputs, its rules, or McDonald's monitoring of franchisee adherence.

80. After Reuters reported on the pricing engine on September 29, 2026, McDonald's posted a statement denying that its tools set prices and asserting that franchisees independently set menu prices at their restaurants, and a McDonald's executive publicly asserted that Reuters had gotten the story wrong.

81. Those features of the McDonald's Pricing System—its pooled data inputs, its rules, and its monitoring of adherence—were not publicly reported before the Reuters report. Plaintiff could not have discovered the conspiracy through reasonable diligence before September 29, 2026.

82. Any applicable limitations period has been tolled by Defendants' fraudulent concealment. In addition, each sale at a supracompetitive price is a new overt act that restarts the limitations period as to that sale.

**J. Enforcement Context**

83. The United States Department of Justice has filed a Statement of Interest in other actions in this District, taking the position that competitors' use of a common pricing algorithm to set benchmark or starting-point prices can be concerted action under Section 1 even if the

competitors do not always follow it, and that exchanging competitively sensitive information through an intermediary can violate the antitrust laws.

84. In October 2024, three United States Senators wrote to McDonald's CEO questioning whether McDonald's price increases had outpaced inflation and requesting information about McDonald's pricing decisions, including how McDonald's makes pricing decisions on individual menu items, how often it reevaluates prices, and whether McDonald's "provide[s] guidelines to franchisees regarding pricing decisions." McDonald's publicly responded that the letter "demonstrates a lack of understanding of our franchise business model" and attributed its price increases to rising costs.

85. In its own antitrust suit against pork processors, McDonald's alleged that the detailed competitor pricing information exchanged through Agri Stats "is not the type of information that competitors would provide each other in a normal, competitive market."

## V. EVIDENCE OF AGREEMENT

### A. Direct Evidence

86. McDonald's franchise agreements and policies establish an express agreement between McDonald's and each franchisee to transmit nonpublic transaction data to McDonald's, to engage with McDonald's approved pricing consultant and tools, and to comply with all policies McDonald's imposes, including as to pricing, on pain of non-renewal.

87. McDonald's statements that McDonald's and its franchisees use the same adviser, that McDonald's issues "our pricing recommendations" in "pricing round[s]," and that franchisees show "very strong adherence" are direct evidence that competing restaurants agreed to delegate pricing to the McDonald's Pricing System and to follow its recommendations.

88. Franchisees' commitments through OPNAD and local cooperatives to nationally advertised price points, the "unanimous alignment through the franchisee field votes," and system-

wide efforts to set core menu pricing "as an entire system" are direct evidence that competing McDonald's restaurants set prices collectively.

### B. Each Restaurant Knew It Was Part of a System-Wide Arrangement

89. The conspiracy did not depend on each restaurant's separate dealings with McDonald's. Each McDonald's restaurant knew that its competitors priced through the same system, received recommendations generated in part from its competitors' data, knew that deviations were recorded and enforced, and acted collectively with other restaurants on price.

90. McDonald's told investors that "[b]oth we and our franchisees" use the same third-party pricing adviser, and McDonald's Franchise Disclosure Document, which every franchisee receives, discloses the fee for "the use of the Base Pricing Engine." The pricing portal's own terms of service told every user that the other users "may be competitors of each other."

91. Compliance was policed. McDonald's records each franchisee's deviations from the recommendations in detail, and corporate officers call franchisees that stray from them. Since 2026, "pricing noncompliance" has been part of the Business Reviews that determine franchisees' "growth and eligibility."

92. Use of the system is mandated. Since January 2026, McDonald's national franchising standards have required every franchisee to be "constructively engaging with McDonald's approved Pricing Consultant and Tools," and McDonald's assesses the outcomes of each franchisee's pricing decisions.

93. Franchisees act collectively on price. Franchisees vote, through McDonald's advertising cooperatives, on nationally advertised price points; in 2025, for example, they "voted to extend" advertising of a $2.99 price point, and McDonald's described developing pricing solutions "as an entire system."

94. Franchisees understood that pricing authority was moving from individual restaurants to a common system. When franchisees organized an independent owners' association in 2018, a franchisee leader warned that "[t]he next control change will be the transfer of Menu Board Pricing to Deloitte and Touche."

## C. Parallel Conduct

### *i. Parallel adoption of the McDonald's Pricing System*

95. Beginning in or around 2019, McDonald's company-owned restaurants and its franchisees abandoned independent pricing in favor of the McDonald's Pricing System. By April 2019, franchisees were using Deloitte's "McDonald's Pricing Analyzer" to set prices. By 2021, McDonald's reported that "both we and our franchisees" were using the same third-party adviser, and that both took "a more consumer research-based approach than we would have several years ago."

96. Adoption was widespread. McDonald's reported "very strong adherence" to its recommendations in 2022 and "high" adoption rates for its pricing strategy in 2023. By 2026, McDonald's explicitly required every franchisee to engage with its approved pricing consultant and tools.

97. The shift was a sharp departure from McDonald's prior practice. McDonald's 2017 Franchise Disclosure Document listed no pricing tool, and McDonald's executives described the McDonald's Pricing System as new.

### *ii. Parallel price increases*

98. After adopting the McDonald's Pricing System, McDonald's restaurants raised prices in parallel. McDonald's reported its U.S. price increases as single system-wide figures each year—roughly 6 percent in 2021 and roughly 10 percent in each of 2022 and 2023—reflecting increases taken across company-owned and franchised restaurants alike.

99. The increases were synchronized. McDonald's took "smaller, more frequent increases" in system-wide "pricing round[s]," evaluating each round before "decid[ing] what we might do next," and took price increases a "few times a year."

100. The increases reached across the menu. Between 2019 and 2024, average prices of McDonald's core items rose between 20 and 44 percent, and the average menu item rose about 40 percent.

101. Company-owned and franchised restaurants moved together. McDonald's CFO credited "the discipline that both our owner/operators and our company restaurants are bringing" to pricing.

102. The pace of increases rose sharply after the McDonald's Pricing System was adopted, from roughly 2 to 3 percent in 2019 to roughly 6 percent in 2021 and roughly 10 percent in each of 2022 and 2023.

**D. Plus Factors**

103. Numerous plus factors confirm that Defendants' parallel conduct resulted from agreement rather than independent decision-making.

***i. Exchange of competitively sensitive information***

104. Each restaurant supplied its current, granular, nonpublic transaction data to a common hub that used the pooled data to generate its competitors' prices. No independent business would allow its confidential data to inform its rivals' prices unless it expected its rivals to do the same.

***ii. Actions against unilateral self-interest***

105. Each restaurant handed its pricing decisions to a common agent. Rather than set prices from its own costs, customers, and competitive judgment, each restaurant priced from recommendations that the same engine generated, from the same pooled data and under rules

McDonald's supplied, for every competing McDonald's restaurant. No independent competitor delegates its pricing to the decision-maker that sets its rivals' prices unless it expects its rivals to do the same.

106. In a competitive market, a restaurant facing double-digit increases at nearby McDonald's restaurants would have an incentive to undercut them and capture customers. McDonald's itself designed its system so that franchisees would compete with other McDonald's restaurants. Instead, restaurants followed common recommendations with "very strong adherence."

107. Restaurants continued to raise prices even as guest counts fell. McDonald's reported that 2024 U.S. comparable sales benefited from average check growth "partly offset by negative comparable guest counts." The decline has continued: according to Reuters, U.S. foot traffic at McDonald's declined year over year in every complete month from March through August 2026. In a competitive market, falling customer counts lead to lower prices, not higher ones. Meanwhile, McDonald's U.S. operating income rose 43 percent, from $4.07 billion in 2019 to $5.81 billion in 2025, as shown in Figure 5.

**FIGURE 5: McDonald's U.S. Operating Income, 2019–2025**




*Source: McDonald's Corp. Form 10-K for fiscal years 2021, 2023, and 2025 (U.S. segment operating income, as reported).*

108. Each franchisee also submitted to monitoring of its adherence to the recommendations. McDonald's records each franchisee's deviations, and "pricing noncompliance" is part of the Business Reviews that determine franchisees' "growth and eligibility." No independent business would accept policing of whether it follows prices derived from its competitors' data unless the arrangement bound its competitors as well.

***iii. Market conditions conducive to collusion***

109. The market for McDonald's menu items has structural features that make coordinated pricing easy to implement, monitor, and sustain.

110. *Inelastic demand.* Customers absorb McDonald's price increases with limited loss of sales, which makes coordinated increases profitable. McDonald's reported that it continued to see "flow-through of 70% to 80% of those price increases." Its CEO told investors that "even though we're pushing through pricing, the consumer is tolerating it well," and credited

McDonald's "ability to actually push through the pricing" to its brand: "there is no substitute for a Big Mac."

111. *Homogeneous products.* McDonald's restaurants sell a uniform menu of standardized products, which makes coordination easy to implement and monitor. Through the McDonald's Pricing System, each restaurant's prices are visible to McDonald's daily.

***iv. Opportunities and mechanisms to collude***

112. Competing restaurants meet regularly through OPNAD, local cooperatives, franchisee field votes, McDonald's-endorsed franchisee organizations, McDonald's Worldwide Convention, and Business Reviews.

## VI. RELEVANT MARKET AND MARKET POWER

113. Defendants' conduct is a horizontal price-fixing conspiracy that is unlawful per se, and no showing of market power or anticompetitive effects is required. *Deslandes*, 81 F.4th at 703. Plaintiff nonetheless alleges the relevant markets below.

114. Defendants' conduct is also unlawful under the rule of reason. Defendants' market power is shown directly by their ability to raise prices every year from 2019 through 2026, including roughly 10 percent per year in 2022 and 2023.

115. If a relevant product market must be defined, the relevant product market is the sale of meals and menu items to consumers by quick-service hamburger restaurants (the "QSR Hamburger Market"). Quick-service hamburger restaurants, such as McDonald's, Burger King, and Wendy's, offer hamburger-centered menus at low prices, with counter, drive-through, and mobile ordering and fast service. Consumers do not regard full-service restaurants, fast-casual restaurants, other categories of quick-service restaurants, or food bought at grocery stores as reasonably interchangeable with quick-service hamburger meals. McDonald's itself analyzes competition by food category, telling investors that across its top ten markets it is the leader "by a

wide margin in beef with more than 40% share in a $50 billion category." And the McDonald's Pricing System pulls the menu prices of nearby Wendy's and Burger King restaurants, reflecting McDonald's own view of which competitors constrain its restaurants' prices.

116. The relevant geographic market is the United States. The McDonald's Pricing System generates recommendations centrally for restaurants nationwide using data pooled from restaurants nationwide. McDonald's issues pricing guidance to all U.S. franchisees on a common schedule, enforces pricing through national franchising standards, and reports U.S. pricing as a single system-wide figure. McDonald's also sets nationally advertised price points through national franchisee votes.

117. Customers throughout the United States buy the same products under the same conditions. Every McDonald's restaurant must serve "only designated food and beverage products" under the "uniform operation of all McDonald's restaurants," and McDonald's promotes its products, and its price points, to customers nationwide through national advertising. In 2024 and 2025, for example, McDonald's advertised a $5 Meal Deal and $5 and $8 Extra Value Meals to customers across the country. Wherever a customer buys from a McDonald's restaurant, the customer faces the same menu, the same nationally advertised prices, and prices generated by the same McDonald's Pricing System. The conspiracy's effects on price are therefore national in scope.

118. In the alternative, the relevant geographic markets are the Metropolitan Statistical Areas ("MSAs") in which McDonald's restaurants are located. Customers buy from McDonald's restaurants near where they live, work, and travel, and choose among the restaurants within that area. McDonald's tells prospective franchisees that "customers typically patronize various

McDonald's restaurants depending on their travel patterns," and that other McDonald's restaurants "may have an effect on the sales of your McDonald's restaurant."

119. Convenience defines the area within which customers turn to alternatives. Drive-thrus operate at about 95 percent of U.S. McDonald's restaurants, and before the COVID-19 pandemic, the drive-thru accounted for about two-thirds of all U.S. sales. MSAs approximate the areas within which customers make those choices, because the federal government delineates each MSA around an urban core and the surrounding counties tied to it by commuting.

120. McDonald's itself analyzes pricing at both the national and more local levels. In each MSA, the McDonald's Pricing System generated recommendations for every McDonald's restaurant using the same rules and pooled data.

## VII. ANTITRUST INJURY

121. Plaintiff and Class members have antitrust standing. Class members who purchased from McOpCo restaurants purchased directly from Defendants. Class members who purchased from franchised restaurants purchased directly from McDonald's franchisees, each of which is a co-conspirator that used the McDonald's Pricing System, transmitted its transaction data to McDonald's, received the system's recommendations, and is subject to the National Franchising Standards.

122. Defendants' conspiracy eliminated independent price competition among McDonald's restaurants. Absent the conspiracy, each restaurant would have set its prices independently, and competition among company-owned and franchised McDonald's restaurants—competition McDonald's itself designed its system to create—would have constrained those prices.

123. Instead, the McDonald's Pricing System raised prices at every restaurant that followed its recommendations. Because the system generated recommendations for every menu

item at every restaurant, using the same rules and the same pooled data, the resulting overcharges affected purchasers throughout the United States, across the menu, and throughout the Class Period.

124. The conspiracy also suppressed the competitive pressure that would otherwise have disciplined each restaurant's prices. Because the same system generated the recommendations for every competing McDonald's restaurant from the same pooled data, each restaurant could raise prices with reduced risk of being undercut by nearby McDonald's competitors.

125. The overcharges persist. The price increases taken through the McDonald's Pricing System have not been reversed, and McDonald's current value offers are discounts from those elevated prices.

126. Plaintiff and Class members purchased menu items directly from Defendants or their co-conspirators and paid supracompetitive prices as a result. They are the first purchasers from members of the conspiracy and the parties most directly injured by it.

127. Paying inflated prices caused by an agreement among competitors to restrain price competition is precisely the type of injury the antitrust laws were designed to prevent, and it flows from that which makes Defendants' conduct unlawful.

128. The overcharges can be measured on a class-wide basis using common evidence, including the McDonald's Pricing System's recommendations and McDonald's restaurant-level transaction data, which McDonald's collects for every restaurant.

## VIII. CLASS ACTION ALLEGATIONS

129. Plaintiff brings this action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Class:

> All persons and entities in the United States who purchased one or more menu items from a McDonald's restaurant in the United States, whether operated by McDonald's or by a franchisee, from January 1, 2019 until the effects of Defendants' conduct cease (the "Class Period").

130. Excluded are Defendants; all McDonald's franchisees; their officers and directors; and any judicial officer assigned to this case and that officer's immediate family and staff.

131. Numerosity. The Class contains many millions of members. Joinder is impracticable.

132. Commonality and predominance. Common questions predominate, including: (a) whether Defendants and their co-conspirators agreed to fix, raise, maintain, or stabilize menu prices through the McDonald's Pricing System; (b) whether Defendants exchanged competitively sensitive information through the McDonald's Pricing System; (c) whether the conduct is unlawful per se or under the rule of reason; (d) whether the conduct raised prices; (e) the measure of class-wide damages; and (f) appropriate injunctive relief.

133. Typicality. Plaintiff's claims arise from the same conduct and legal theories as those of all Class members.

134. Adequacy. Plaintiff will fairly and adequately protect the Class's interests and has retained counsel experienced in antitrust class actions.

135. Superiority. A class action is superior because individual damages are small relative to the cost of litigating complex antitrust claims.

136. Injunctive relief. Defendants have acted on grounds generally applicable to the Class, making injunctive relief appropriate for the Class as a whole.

## IX. CLAIMS FOR RELIEF

### COUNT I

### Sherman Act § 1, 15 U.S.C. § 1 — Price Fixing

137. Plaintiff incorporates all preceding paragraphs.

138. Beginning no later than 2019 and continuing to the present, Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to fix, raise, maintain, and stabilize the prices of menu items sold at McDonald's restaurants in the United States.

139. The conspiracy consisted of an agreement among competing McDonald's restaurants—company-owned and franchised—organized and enforced by McDonald's, to delegate pricing to the McDonald's Pricing System, to supply that system with their nonpublic transaction data, to receive restaurant-level price recommendations generated from competitors' pooled data, and to adhere to those recommendations.

140. In furtherance of the conspiracy, Defendants and their co-conspirators, among other things: (a) transmitted nonpublic transaction data to McDonald's for use in the McDonald's Pricing System; (b) received and implemented restaurant-level and item-level price recommendations in coordinated pricing rounds; (c) applied McDonald's rules and corporate targets to generate recommendations for competing restaurants; (d) monitored adherence and recorded deviations; (e) made pricing compliance part of Business Reviews affecting renewal and growth; and (f) agreed to nationally advertised price points through cooperatives and field votes.

141. The conspiracy is a horizontal agreement among competitors to fix prices and is unlawful per se. McDonald's participates both as the organizer of the conspiracy and, through its McOpCo restaurants, as a competitor of the franchisee co-conspirators.

142. In the alternative, the conspiracy is unlawful under a quick-look analysis, because its anticompetitive effect on prices is obvious, or under the rule of reason. The conspiracy had substantial anticompetitive effects, including higher prices and the elimination of independent price competition among McDonald's restaurants, and Defendants possess market power as alleged above.

143. The conspiracy is not reasonably necessary to any legitimate procompetitive objective. Any procompetitive justification could be achieved through substantially less restrictive means, including pricing tools that do not use competitors' nonpublic data, and that are not tied to renewal or growth.

144. Each Defendant knowingly participated in the conspiracy and is jointly and severally liable for the overcharges it caused.

145. As a direct and proximate result, Plaintiff and Class members paid supracompetitive prices and were injured in their business or property. They are entitled to treble damages, costs, and attorneys' fees under 15 U.S.C. § 15.

**COUNT II**

**Sherman Act § 1, 15 U.S.C. § 1 — Information Exchange**

146. Plaintiff incorporates all preceding paragraphs.

147. Defendants and their co-conspirators agreed to exchange, through the McDonald's Pricing System, competitively sensitive information, and to use that information to generate each restaurant's prices.

148. The information exchanged was current, granular, and nonpublic. It included transaction-level sales, prices, and product mix for each restaurant, and monthly restaurant-level profit and loss statements. The information was not available to consumers or to the public.

149. The information was exchanged among competitors. McDonald's company-owned restaurants and franchised restaurants compete with one another for the same customers, by McDonald's own design.

150. The exchange was continuous and centralized. Every restaurant's transaction data flows to McDonald's, and the McDonald's Pricing System uses the pooled data to generate restaurant-level and item-level price recommendations for competing restaurants.

151. The structure of the market makes the exchange especially likely to harm competition. McDonald's restaurants sell standardized products under a uniform system, and McDonald's monitors adherence and enforces compliance through renewal and growth decisions.

152. The exchange is unlawful under the rule of reason. It had the actual effect of reducing price competition and raising prices, and it served no legitimate procompetitive purpose that could not have been achieved through less restrictive means.

153. As a direct and proximate result, Plaintiff and Class members paid supracompetitive prices and are entitled to treble damages, costs, attorneys' fees, and injunctive relief under 15 U.S.C. §§ 15 and 26.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Certify the Class under Rule 23, appoint Plaintiff as class representative, and appoint her counsel as class counsel;

B. Declare that Defendants' conduct violates Section 1 of the Sherman Act;

C. Award Plaintiff and the Class damages, trebled, in an amount to be determined at trial;

D. Permanently enjoin Defendants from (i) using one franchisee's or McOpCo restaurant's nonpublic data to generate pricing recommendations for competing

restaurants; (ii) monitoring franchisees' adherence to pricing recommendations or considering pricing compliance in Business Reviews, renewal, or growth decisions; and (iii) entering into any similar arrangement;

E. Award pre- and post-judgment interest;

F. Award attorneys' fees and costs; and

G. Grant such other relief as the Court deems just.

## XI. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 15, 2026

Respectfully submitted,

*/s/ Richard D. Schwartz*

**BERGER MONTAGUE PC**
Richard D. Schwartz
110 N. Wacker Drive, Suite 2500
Chicago, IL 60606
Tel: (773) 257-0255
rschwartz@bergermontague.com

Zachary D. Caplan (*pro hac vice forthcoming*)
Julia McGrath (*pro hac vice forthcoming*)
Michaela L. Wallin (*pro hac vice forthcoming*)
Sarah Zimmerman (*pro hac vice forthcoming*)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
zcaplan@bergermontague.com
jmcgrath@bergermontague.com
mwallin@bergermontague.com
szimmerman@bergermontague.com

*Counsel for Plaintiff and the Proposed Class*